# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| American Chemical Service, Inc., | |
| Plaintiff, | |
| v. | Case No. 2:13-CV-177 JVB |
| United States Fidelity & Guaranty Company and National Union Fire Insurance Company, | |
| Defendants. | |

**OPINION & ORDER**

Plaintiff, American Chemical Service, Inc. (ACS), brought this lawsuit against its insurers, United States Fidelity & Guaranty Company (USF&G) and National Union Fire Insurance Company (National Union), over an alleged breach of their duty to defend. Plaintiff maintains that both Defendants had a duty to defend them in relation to a claim by the Environmental Protection Agency (EPA) that alleged Plaintiff was responsible for environmental cleanup costs at the Gary Developmental Landfill (GDL). Plaintiff filed a motion for partial summary judgement (DE 31) seeking judgment as a matter of law on USF&G's breach of their duty to defend.[1]

Defendant, USF&G, responded to Plaintiff's Motion for Partial Summary Judgment by filing a Counter-Motion for Summary Judgment.[2] (DE 95 and DE 98.) Defendant maintains that, in this instance, a settlement agreement between the parties released them from a duty to defend. Alternatively, Defendant contends that even if a duty to defend survived the settlement

---

[1] After filing their Motion for Partial Summary Judgment (DE 31), Plaintiff filed a Joint Motion to Amend (DE 85), which modified their original motion by no longer seeking relief against National Union. Accordingly, this Opinion and Order will focus solely on the dispute between Plaintiff and USF&G.

[2] Defendant filed a Motion for Oral Argument on its Counter-Motion for Summary Judgment. The Court found oral argument unnecessary in this instance and Defendant's Motion (DE 101) is denied as moot.

agreement, their duty to defend Plaintiff has not been triggered. Defendant reasons that its duty to defend is only initiated by a lawsuit, and there is currently no lawsuit filed against Plaintiff regarding its shipment of hazardous materials to GDL.

## A. Background

Plaintiff, headquartered in Griffith, Indiana, is a chemical manufacturing company that supplies oil and chemicals to various industries. (DE 1, Compl. at 1.) From 1976–1981, Plaintiff focused its business on solvent reclamation and chemical processing. (*Id*.) Plaintiff's solvent reclamation operation was a four-step process. First, clients would ship used solvents to Plaintiff's headquarters for reclamation or disposal. (DE 102-3, Tarpo Dep. at 42–44.) Next, Plaintiff would distill these spent solvents to reclaim usable solvents that would then be shipped back to their client. (*Id*. at 44.) Third, Plaintiff would sell excess reclaimed solvent, which the original client did not have capacity to utilize, to third-parties. (*Id.* at 44–45.) Lastly, Plaintiff would send any unusable byproduct produced by the reclamation process to a landfill. (*Id*.)

Until the mid-1970s, Plaintiff would landfill the unusable byproduct on its property, which was collocated with its headquarters. (*Id*. at 60, 77–79.) After complaints from local officials regarding the effects of this practice, Plaintiff began shipping its waste to off-site landfills, including the Gary Developmental Landfill (GDL), Calumet Containers sites in Indiana and Illinois, and at a Thermo Chem landfill site located in Muskegon, Michigan. (*Id.* at 177–179; DE 102-13, Aug. 22, 1990 Compl. at 3, 7.)

Defendant provided insurance coverage to Plaintiff from 1955 to 1984. (DE 1, Compl. at 6; DE 99, Def.'s Br. at 10.) The policies in question here were issued by Defendant in 1980 and 1981. (DE 116, Pl.'s Resp. at 3.) Between 1987 and 1990, Plaintiff was notified by the EPA that it may be liable for environmental cleanup costs at three locations: (1) the ACS site in Griffith,

2

Indiana; (2) the Thermo Chem site in Muskegon, Illinois; and (3) the Calumet Container sites, which were located in both Indiana and Illinois. The alleged environmental damage took place as a result of Plaintiff using their own land as a landfill for hazardous materials, as well as shipping hazardous materials to the Thermo Chem and Calumet Container sites where they were improperly disposed of. (DE 102-13, Aug. 22, 1990 Compl. at 2–6.) These lawsuits and accompanying regulatory actions led to a dispute over Defendant's coverage of Plaintiff. (DE 116, Pl.'s Resp. at 3.)

In 1990, as a result of the coverage dispute, Defendant filed a declaratory judgment action against Plaintiff. Defendant asked the court to find, among other things, that their insurance policies provided no coverage for Plaintiff's environmental violations, that Defendant had no duty to defend Plaintiff or its employees against these allegations, and that Defendant did not have a duty to pay any monetary judgement as a result of Plaintiff's actions at these three sites. (DE 102-13, Aug. 22, 1990 Compl. at 14–17.)

This dispute was eventually resolved in 1993 through a settlement agreement (1993 Agreement). Defendant provided Plaintiff with substantial settlement sum to "exhaust the property damage aggregate" under the policies issued. (DE 100, Settlement Agreement at 6–7.) In return for the monetary settlement, ACS agreed to:

> release and forever discharge USF&G . . . from and against any and all claims, demands costs, losses or damages relating to property damage that it has or may have against USF&G which were or could have been raised in the litigation and which in any way relate to the Policies . . . and which arise from or relate to the ACS, Thermo Chem, and Calumet Container sites.

(*Id.* at 8–9.)

Turning to the EPA enforcement action at GDL, Plaintiff concedes that it sent solvent reclamation byproducts to GDL from 1980 to 1981. (DE 1 Compl. at 1.) In fact, Plaintiff claims that it sent 37 separate, manifested loads of waste byproducts from its facility in Griffith,

3

Indiana, to GDL during this time period. While Defendant contends that Plaintiff shipped waste byproducts to GDL outside of this time period and in excessive amounts, this dispute is not material. (DE 99, Def.'s Br. at 5–7.) In November 1981, GDL notified Plaintiff that it would no longer accept its waste byproducts due to a fire at their facility caused by one of the earlier shipments. (DE 102-3, Tarpo Dep. at 226.)

Plaintiff was aware of the EPA and Indiana Department of Environmental Management (IDEM) investigation of GDL since its inception. On July 1, 1985, Plaintiff received a letter from IDEM requesting manifest of shipments of hazardous materials from Plaintiff to GDL in 1981. (DE 102-14, Ltr. at 1.) This information was requested to assist in the closure of GDL as a hazardous waste disposal facility. (*Id.*) Then, on September 24, 1986, the EPA sent Plaintiff a similar request for information on their shipments to GDL based on the enforcement powers under the Resource Conservation and Recovery Act (RCRA). (DE 102-15, Ltr. at 1.) Lastly, in August 1987, the president of ACS was subpoenaed to testify before the EPA regarding Plaintiff's shipments to GDL and provided the requested testimony on September 10, 1987. (DE 102-17, Subpoena; DE 102-19; ACS President's Testimony.) This would be the last contact between the EPA, IDEM, and Plaintiff regarding GDL until 2011.

On November 7, 2011, Plaintiff received a General Notice Letter from the EPA, which stated that ACS may be liable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for the cleanup of improperly released hazardous materials at GDL. (DE 102-22, Ltr. at 1.) On February 2, 2012, Plaintiff notified Defendant in writing of the EPA claim against them regarding their shipment of hazardous waste to GDL. (DE 1, Compl. at 4.) On February 25, 2013, Plaintiff received a Special Notice Letter from the EPA again identifying them as a Potentially Responsible Party (PRP) for the improper release of hazardous materials at GDL, which included a formal demand for reimbursement of $628,813.29

4

for costs already incurred by the EPA at GDL. (DE 102-23, Ltr. at 1.) Plaintiff sent this Special Notice Letter to Defendant on March 15, 2013. (DE 1, Compl. at 5.) Plaintiff also maintains that from when it first notified Defendant of the EPA claim until May 15, 2013, Defendant attempted to negotiate an extra-contractual agreement that would govern their representation of Plaintiff in this matter. (*Id*. at 4–5.) Plaintiff asserts that this extra-contractual proposal by Defendant was heavily slanted in Defendant's favor and did not reflect the parties' original agreement. (*Id.*)

### B. Procedural History

Plaintiff filed a Complaint for Declaratory Relief and Damages that alleges that Defendant had a duty to defend and indemnify Plaintiff against the EPA enforcement action at GDL. Plaintiff contends that Defendant's inaction was a breach of the insurance contract. Plaintiff also maintains that Defendant's refusal to defend and indemnify was undertaken in bad faith and constitutes a breach of an insurer's duty of good faith and fair dealing. (DE 1, Compl. at 8–19.) Plaintiff filed a partial motion for summary judgment requesting the court to find, as a matter of law, that Defendant had a duty to defend Plaintiff and breached that duty. (DE 31, Mot. Summ. J. at 1.)

As a Response, Defendant filed a Cross-Motion for Summary Judgment that maintains it has no duty to defend Plaintiff in this matter. Defendant's brief in support of its motion outlines two justifications for why there was no duty to defend Plaintiff in its dispute with the EPA. First, Defendant contends that the 1993 Agreement between the parties released it from any duty to defend Plaintiff in this matter. Alternatively, Defendant maintains that it is inconsequential if the 1993 Agreement did not extinguish its duty to defend Plaintiff, because this dispute is not covered under its policies. Defendant maintains that their insurance policies only require a defense to "any suit against the Insured seeking damages on account of . . . property damae" and

5

the EPA has not filed a lawsuit against Plaintiff. Instead, the EPA has only initiated administrative proceedings against Plaintiff pursuant to §§ 106 and 107 of CERCLA.

### C. Legal Standard

#### 1. *Summary Judgment*

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and

resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

As described above, summary judgment is only appropriate by the terms of Rule 56(c) where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id*. at 648. Mindful of these standards, the court now turns to the substance of the parties' motions.

### 2. *Contract Interpretation Under Indiana Law*

The goal of contract interpretation is to give effect to the parties' intent. The construction of a written contract is a pure question of law. *S.C. Nestel, Inc. v. Future Constr., Inc.*, 836 N.E.2d 445, 449 (Ind. Ct. App. 2005). A settlement agreement, since it is contractual in nature, is likewise "interpreted according to the general rules for contract construction." *Bailey v. Mann*, 895 N.E.2d 1215, 1217 (Ind. 2008). The unambiguous language of a contract is conclusive and binding on the parties and the court; the parties' intent is determined from the four corners of the document. *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App.

2007). However, if there is an ambiguity, the Court "may consider extrinsic (parol) evidence to resolve it, with the aim of carrying out the parties' likely intent. *Pohl v. Pohl*, 15 N.E.3d 1006, 1009 (Ind. 2014).

When trying to ascertain the parties' intent the Court must read the contract as a whole and will make every effort to construe its language so as not to render any words, phrases, or terms ineffective or meaningless. *Four Seasons*, 870 N.E.2d at 501. In discerning the meaning of a contract term, a court must also apply its general knowledge of how the business world operates. *Beanstalk Group, Inc., v. AM Gen. Corp.*, 283 F.3d 856, 862 (7th Cir. 2002). Notably, courts construe contracts "in a way that gives each term independent meaning, rather than rendering one surplusage." *Pohl*, 15 N.E.3d at 1014.

**D. Analysis**

The Court must first address Defendant's motion as it presents two threshold questions that must be answered before the Court can determine if Defendant still has a duty to defend Plaintiff. First, the Court must determine whether the 1993 Agreement served to release Defendant's from its duty to defend Plaintiff. If the 1993 Agreement is inapplicable to this dispute, the Court then must determine whether the dispute between Plaintiff and the EPA is a "suit" as described in the insurance policies issued by Defendant to Plaintiff. If the 1993 Agreement is inapplicable to the GDL dispute and Plaintiff's clash with the EPA is a suit, the Court will then address Plaintiff's Motion for Partial Summary Judgment. Once at this point, the analysis is simple; Defendant's admitted refusal to defend Plaintiff necessarily means that Plaintiff's Partial Motion for Summary Judgment must be granted.

1. *Effect of the Settlement Agreement*

Plaintiff and Defendant both agree that the 1993 Agreement contains four operative clauses that must be satisfied to release Defendant from its duty to defend. (DE 116, Pl.'s Resp. at 8; DE 99, Def.'s Mot. Summ. J. at 1.) First, the 1993 Agreement releases Defendant from any and all claims relating to property damage. There is no dispute that the alleged environmental damage satisfies this element. Second, the 1993 Agreement applies to claims that Plaintiff had or may have had against Defendant, which were or could have been raised in the 1990 declaratory judgment action.[3] Third, the 1993 Agreement applies to the policies issued to Plaintiff by Defendant; this element is also undisputed. Lastly, the 1993 Agreement covers only those claims that arise from or relate to the ACS, Thermo Chem, and Calumet Container sites. In this case, the latter clause is dispositive of the matter.

Defendant contends that since the hazardous materials that Plaintiff shipped to GDL originated at Plaintiff's headquarters, the 1993 Agreement relieves it from its duty to defend and indemnify Plaintiff. Defendant argues that the phrase "arise from or relate to" the ACS Site should be interpreted to cover the shipment of materials from ACS to GDL. Plaintiff counters that "arise from or relate to" references the landfills at these three sites themselves and not Plaintiff's entire solvent reclamation operation and shipping of unusable solvent byproducts to landfills for disposal. Plaintiff also contends that Defendant's desired interpretation would render the reference to the Thermo Chem, and Calumet Container sites surplasage, which is counter to the canons of Indiana contract law. Plaintiff is correct in both respects.

---

[3] Defendant provided an Affidavit from Daniel Sullivan that offered expert testimony regarding this element. Plaintiff filed a Motion to Strike this affidavit. The Court did not rely on Mr. Sullivan's Affidavit in reaching its decision so the Motion to Strike (DE 118) is denied as moot.

The Thermo Chem, Calumet Container, and GDL sites all received shipments of hazardous materials from Plaintiff's headquarters. Nevertheless, the 1993 Agreement fails to mention, in any way, the GDL site or shipments of hazardous materials from Plaintiff to any other location. Instead, the 1993 Agreement only references the ACS, Thermo Chem, and Calumet Container sites. While materials from Plaintiff's solvent reclamation operation polluted all three sites listed in the 1993 Agreement, they also share another, more significant characteristic: each had landfills that were the subject of litigation at the time the 1993 Agreement was negotiated. The 1993 Agreement addressed these three landfills, or sites, not the entirety of Plaintiff's operations as the Defendant suggests. This shared characteristic convinces the Court that the language in 1993 Agreement was referencing any property damage that arose from or related to the landfills on these three sites.

The Court's interpretation is also supported by the incongruity of the 1993 Agreement if Defendant's interpretation is adopted. Thermo Chem and Calumet Container served the same role for Plaintiff as GDL. If the 1993 Agreement was truly designed to release Defendant from any liability created by Plaintiff's solvent reclamation operations, why are these additional sites listed? Moreover, why wouldn't the language of the 1993 Agreement just state that Defendant is released from any property damage claims that reference these policies and occurred as a result of Plaintiff's solvent reclamation? In this case, the answer is simple. The 1993 Agreement was only designed to serve as a release for claims arising from the landfills at these three sites. Accordingly, the Court finds that Defendant's duty to defend Plaintiff, with regards to the property damage at GDL, was not released by the 1993 Agreement.

## 2. *Duty to Defend*

Defendant also asserts that it did not breach its duty to defend even if the 1993 Agreement is inapplicable to the current dispute between Plaintiff and the EPA over GDL. Defendant contends that its policies only create a duty to defend against a lawsuit and no lawsuit exists in this case. Plaintiff counters that Indiana law clearly articulates that when the EPA labels a company a Potentially Responsible Party (PRP) the insurer's duty to defend is triggered. Again, Plaintiff is correct.

The Indiana Court of Appeals addressed the issue of whether a PRP letter is a suit in *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285 (Ind. Ct. App. 1997). In *Dana*, the Court analyzed whether an insurer's duty to defend was triggered by EPA enforcement actions taken pursuant to CERCLA. *Id.* at 288. The insurance policy in *Dana*, like the policy here, required the insurer to defend "any suit against the insured." *Id.* at 289. The Court first determined that the term "suit" was ambiguous and was partly convinced by the "division of authority on this [issue] . . . [which] is evidence that more than one reasonable interpretation of the term 'suit' is possible." *Id.* at 295 (citing *Indiana Ins. Co. v. O.K. Transport, Inc*., 587 N.E.2d 129, 132 (Ind. Ct. App. 1992). The Court eventually found that "coercive and adversarial administrative proceedings" were suits under the policy and specifically referenced demands made pursuant to § 107 of CERCLA as an example. *Id*. at 296. The Court concluded by noting that "mere notification or investigation when no enforcement action is contemplated" is insufficient to trigger the duty to defend. *Id.* at 296–297.

Defendant counters the precedential value of *Dana* by citing six decisions of the Indiana Supreme Court. All six decisions stand for the general proposition that if the terms of a contract are unambiguous they should be given their plain and ordinary meaning. Defendant maintains that these six cases should persuade this Court to overlook *Dana*.

Defendant's argument is unavailing because *Dana* and the cases cited by Defendant are easily distinguishable. In *Dana*, the Indiana Court of Appeals made a deliberate and specific finding that the term 'suit' was ambiguous. The Court based this finding on the disparity of treatment the term has received in different jurisdictions. For instance, the Court referenced decisions that found: "1) that the term 'suit' is unambiguous and includes administrative proceedings; 2) that the term 'suit' is unambiguous and includes only courthouse lawsuits; and 3) that the term 'suit' is ambiguous and is therefore to be construed against the insurer." *Dana*, 690 N.E.2d at 295. This finding of ambiguity led the Court to use a broader definition of the term suit that includes EPA administrative proceedings, so long as there was a showing of "coerciveness or adversariness." *Id*. at 296. All of the cases cited by Defendant are examples of the Indiana Supreme Court, when examining different contractual language than what is at issue here, making the opposite finding regarding ambiguity. This arbitrary comparison is not useful in predicting how the Indiana Supreme Court would handle this case. Moreover, "unless we have a good reason to believe that the state's highest court would reject a decision by an intermediate court we treat that decision as authoritatively stating the law of the state." *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co*., 833 F.2d 633, 638-639 (7th Cir. 1987). Thus, Defendant's argument is insufficient to convince this Court to disregard *Dana*.

Plaintiff's dispute with the EPA is directly comparable to those described in *Dana* as being properly defined as a suit. The EPA notified Plaintiff of its potential liability under §§ 106 and 107 of CERCLA. (DE 103-22, Ltr. at 1–2; DE 103-23, Ltr. at 1–2.) The EPA then made a formal demand to Plaintiff for reimbursement for costs already incurred at GDL, which totaled $628,813.29. (DE 103-23, Ltr. at 4.) The correspondence from the EPA then explains how Plaintiff can negotiate a settlement and cooperate with the EPA and the potential penalties if they fail to do so. (*Id*. at 2.) This correspondence shows that the EPA is engaging in more than mere

notification or investigation. Accordingly, consistent with *Dana,* the Court finds that Defendant's duty to defend was triggered by the General Notice and Special Notice letters (DE 103-22 & DE 103-23) from the EPA to Plaintiff. Consequently, Defendant's admitted inaction in response to these letters is sufficient evidence for the Court to find that Defendant breached its duty to defend Plaintiff.

### E. Conclusion

As a result, the Court GRANTS Plaintiff's Partial Motion for Summary Judgment (DE 31) and finds that Defendant had a duty to defend Plaintiff with regard to the EPA CERCLA action at Gary Developmental Landfill and breached its duty. Consequently, Defendant's Cross-Motion for Summary Judgment (DE 95 and 98) is DENIED. Defendant's Motion for a Hearing (DE 101) is DENIED as moot. Similarly, Plaintiff's Motion to Strike the Affidavit of Defendant's Expert (DE 118) is DENIED as moot with permission to refile at a later stage of the proceedings if necessary.

**SO ORDERED** on April 2, 2015.

    s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE